¡BRISCOE, Circuit Judge,
concurring and dissenting:
I agree with the majority’s disposition of the outrageous conduct claim, but respectfully dissent from its affirmance of summary judgment in favor of Wal-Mart on Adler’s Title VII sexual harassment claim. There is substantial support in the record for Adler’s claim that she was subjected to continuous *680 sexual harassment by multiple Wal-Mart employees over a period of several months and that Wal-Mart’s response to the harassment was not prompt and effective. In granting summary judgment, the district court concluded as a matter of law that an employer’s remedial measures are effective when they cause individual harassers to stop, without regard to whether the measures are effective in deterring future harassment by others. I disagree with that legal conclusion and would reverse the summary judgment entered in favor of Wal-Mart on Adler’s sexual harassment claim.
The majority concludes Adler failed to carry her burden in responding to Wal-Mart’s motion for summary judgment by failing to establish any issue of disputed material fact. In ruling against Adler, the majority limits its review of the record to only those pages specifically cited by Adler to the district court, ignoring the pages cited by Wal-Mart to the district court. By refusing to consider evidence cited by Wal-Mart, the majority ignores the burden of the party moving for summary judgment to show the absence of material questions of fact. See Kaul v. Stephan, 83 F.3d 1208, 1212 (10th Cir.1996). Wal-Mart submitted the complete depositions of Adler, Berwick, McFarland, Clauser, and Kirchmeier and specifically referred the district court to over 100 pages from those depositions.[1] Between them, the parties specifically referred the court to 121 pages from depositions, several deposition exhibits, and Adler’s verified complaint.[2] ' In assessing Adler’s response to the motion for summary judgment, we must consider at a minimum all of the evidence specifically cited to the district court by both parties.
The majority’s rigid application of a technical procedural rule to avoid deciding a claim on the merits is contrary to the purpose underlying modern rules of procedure. This court has long recognized the “ends of justice are not served when forfeiture of just claims because of technical rules is allowed.” Travelers Indemnity Co. v. United States, 382 F.2d 103, 105 (10th Cir.1967). As we explained in Denver & Rio Grande Western Railroad Co. v. Union Pacific Railroad Co., 119 F.3d 847, 848-49 (10th Cir.1997), “case law interpreting [procedural] rules is founded upon a policy which favors deciding cases on the merits as opposed to dismissing them because of minor technical defects.”
Adler’s sexual harassment claim is factually supported in the evidence cited to the district court. In reviewing the district court’s grant of summary judgment, we must view the factual record and reasonable inferences drawn from it in the light most favorable to the party opposing summary judgment. Kaul, 83 F.3d at 1212. The evidence is sufficient to establish Adler, the first woman in her department, was subjected to recurring sexual harassment by multiple WalMart employees over a period of several months. Despite knowledge that the harassment was a recurring problem involving numerous workers, Wal-Mart failed to take prompt action reasonably calculated to send a message to the workforce as a whole that harassment would not be tolerated.
The majority departs from our standard of review by failing to view the facts in the light most favorable to Adler and by overlooking evidence in her favor. When viewed in the light most favorable to Adler, the evidence presented is sufficient to survive Wal-Mart’s motion for summary judgment.
Maintenance manager Kirchmeier expected trouble from Wal-Mart employees when he selected Adler to be a battery room mechanic in October 1993 because she was the first female selected to work in the building and in his department. According to co *681 worker Little, a “lot of people had problems when she was given the battery job, because she was a woman,” and they said the only reason she got the job was “because she was a woman, and that she must have done some favors'for somebody to get the promotion.” App. at 780-81. Soon after she started, floor workers, forklift drivers, and distribution break pack workers began making “rude comments indicating that she had to perform acts to get the job.” Id. at 688. It can reasonably be inferred the favors and acts referred to were sexual in nature. Kirehmeier stopped the initial outbreak of harassment by announcing to the supervisor of the forklift drivers that he would not permit lift drivers to bring their vehicles in for maintenance if the harassment continued. He then regularly asked Adler if she was being harassed.
In December 1993, eoworker Zalaznik offered to perform electrical work at Adler’s home in exchange for oral sex. Wal-Mart denied receiving any reports of harassment in December or January, but Adler testified she reported it to her immediate supervisor Larson. In January 1994, Zalaznik, in the presence of coworkers McFarland and Berwick, accused Adler of engaging in oral sex with Kirehmeier to obtain her job. Zalaznik also made another crude sexual suggestion to Adler in January. According to Adler, she again reported Zalaznik’s conduct to Larson and reported it to Kirehmeier when he asked her if she was being harassed. However, Kirehmeier did not recall reports of harassment in January. According to Adler, Larson told her Kirehmeier was going to fire all of tliem if they did not get along, and Adler became reluctant to report harassment to Kirehmeier.[3]
In March 1994, Zalaznik made another crude sexual suggestion to Adler in the parking lot after work. He called her a tramp the next day at work. Adler did report the comments to Larson and was told initially there was nothing Wal-Mart could do about the harassment because it did not occur on company time, Larson reported the incident to Kirehmeier because he was unsure what to do since it occurred off the clock. Kirehmeier understood that Larson told Zalaznik to “[kjnock this stuff off.” App. at 700. Zalaznik was given a verbal warning but was not formally written up because the harassment did not occur on company time. Adler testified that Zalaznik stopped making sexual remarks to her. :
Kirehmeier testified: “I did, again, stress to the entire department that we would not accept inappropriate behavior, conduct, or comments to anyone.” “I did it continuously.” App. at 701. While this shows Kirchmeier tried to end the harassment, it also shows he perceived the problem as a recurring one involving many employees.
Despite Kirchmeier’s efforts, Adler was subjected to continuous harassment by McFarland and Berwick. She stated that “continuously through 1994,” and “[e]very time I was around him,” McFarland made sexually suggestive comments, App. at 192-93, and Berwick “grabbed my waist several times as he has walked by me.” Id. at 807. Adler testified that Berwick and McFarland “have both, mány times, taken anything from hammers to broomsticks and put them between their legs, call[ed] my name, then stroke[d] the handle.” Id. It can reasonably be inferred there were too many incidents with Berwick and McFarland for Adler to specifically recount all of them. At some point, another coworker she knew as Tony made unwanted sexual advances toward her and told her he would deny it if she told anyone.
Adler told “most of the guys in the maintenance department,” App. at 231, about the ongoing harassment by Berwick and McFarland, and named several coworkers she had told. She also told cleaning supervisor Schwartz about the ongoing harassment. She reported the constant harassment to Trauemieht after he became a supervisor and Trauernicht witnessed one of the com *682 ments by Berwick. Although Adler could not recall exactly when this occurred, she knew it was after Trauernicht became a supervisor because she recalled another worker told her he was surprised Trauernicht did nothing about it. The majority departs from our standard of review by viewing this evidence in a light unfavorable to Adler and concluding she did not present any evidence that Trauernicht was a supervisor when he heard the comment. The determination of credibility and the weighing of evidence are not our function in reviewing a summary judgment. See Kaul, 88 F.3d at 1212. Whether Trauernicht was a supervisor when he heard the comment was a question of material fact.
Adler testified that Larson “heard a lot of the comments” by McFarland and at least one comment by Berwick. ’ App. at 232. She also testified, “I’m sure I mentioned it [to Larson] after the August deal and I’m sure I mentioned it before,” although she did not recall exactly when. Id. at 233. Adler could not recall exactly what comments she reported, but she recalled that she complained generally about sexual comments. She “indicated that [she] wanted it to stop, and [she] was more demanding after August of ’94.” Id. at 237. The majority holds Adler to an unrealistically high standard of precise recall and departs from our standard of review by improperly weighing this evidence and concluding it has no evidentiary value. Whether Adler’s supervisors were aware of the ongoing harassment was a question of material fact. Thus, the record established for purposes of summary judgment that, despite the knowledge of three supervisors and many coworkers, Wal-Mart did nothing about the constant, ongoing harassment until Adler formally reported the culminating incident on August 14.
There was no supervisor at work on Sunday, August 14. According to Adler, the incident began when Berwick and McFarland shook a bottle of baby powder at her and said they were going to powder her bottom. She got back at them by soaking their cart seats. McFarland telephoned Adler, telling her to meet them in the parts room for sex. She was so frightened she tried to hide. When she encountered the two while she was driving a forklift, Berwick, with McFarland’s encouragement, suggested they have sex on the forklift. He climbed on, wrapped his leg around her, and made thrusting motions against her. Adler pushed him off. According to Berwick and McFarland, Adler started the forklift incident by telling them she had a sexual fantasy about having sex on a forklift and her body language indicated she was inviting Berwick to get on the lift with her. McFarland stated Berwick did not wrap his leg around Adler, described the incident as a joke, and said that Adler continued to engage in horseplay with them by soaking their cart seats. Contrary to our standard of review, the majority accepts the sequence of events as related by Berwick and McFarland. The only horseplay Adler admitted was soaking their cart seats before the forklift incident. Coworker Goeppinger testified Adler was upset that day and told him about the incidents and that she was so frightened she tried to hide.
Adler reported the incidents to Larson. Kirchmeier also learned of the incidents and Adler met with Kirchmeier and Personnel Director Clauser. Clauser described Adler as serious and upset. She gave a written statement which described some of the earlier harassment by Berwick and McFarland as well as the August 14 incidents. Clauser interviewed ten people.
Following Clauser’s investigation, Adler was disciplined on September 15, 1994, with “verbal coaching,” the lowest level of discipline practiced by Wal-Mart, for making inappropriate sexual comments unrelated to the August 1U incidents and for joking about fabricating a sexual harassment claim against Kirchmeier. Adler told Clauser she had been approached by a coworker about fabricating a sexual harassment claim. The coworker said, “Why don’t you do us all a favor and take Jesse out on sexual harassment.” Adler responded, “I don’t think you have enough money to do that.” The worker said, “How much do you want?” or “We can get you enough to retire on,” and she replied, “No, you couldn’t get that much money.” App. at 491. Viewed in the light most favorable to Adler, the evidence shows Adler re *683 garded the exchange as a joke. Clauser conceded it was probably in jest but felt discipline was justified because he considered it inappropriate to joke about falsely accusing someone of sexual harassment.
Contrary to our standard of review, and contrary to evidence cited to the district court, the majority states the record shows Clauser found Adler participated in the joking with Berwick and McFarland, presumably the horseplay and sexual banter. McFarland said Adler participated in on August 14. The majority also states Clauser learned Adler had “discussions” with coworkers about making a false sexual harassment claim against Kirehmeier, overlooking deposition pages cited to the district court showing even Clauser considered the discussions to be in jest.
When interviewed by Clauser, Berwick denied the whole incident. McFarland admitted some of it, but minimized its seriousness and stated Adler willingly participated. Berwick and McFarland were disciplined for the August 14 incidents. McFarland was given “a verbal eoaching/reprimand” for inappropriate sexual remarks, and Berwick was given a “decision-making day,” a one-day paid suspension for inappropriate sexual gestures, dishonesty about the incidents, and safety violations.
It can reasonably be inferred the discipline imposed was not widely known in the company because not even Adler knew they had been disciplined. Although Berwick and McFarland stopped harassing her after Clauser’s investigation, Adler still did not know at the time of her deposition what discipline they had received. It could also be reasonably inferred the discipline was ineffective in deterring potential harassers because Medina harassed Adler on November 9 by inappropriately running his hand down her back to the tailbone while trying to convince her to adjust his lift so it would go faster. The majority views this incident in a light unfavorable to Adler, suggesting Medina was only thought to be the harasser. This is a question for the trier of fact. Coworker Runyon, generally known as Moe, harassed Adler on November 12 by running his fingers through her hair and on the back of her neck while discussing service for the forklift he was operating.
Adler reported the two incidents to Larson, she prepared a written report, and Clauser investigated. Medina was not disciplined because there was no independent witness to the incident. There was an independent witness to the Runyon incident and Runyon also admitted the incident. He was “coached,” i.e., written up, rather than punished with a disciplinary step. A few days later, Kirchmeier told Adler the problem had been solved, but on November 19, Runyon came over to where Adler was working and said he would love to run his fingers through her hair again.. She told Larson, who “made [Adler] feel like a big baby, ... like [she] was making a big deal of it.” App. at 308. Adler went on leave of absence that day and never returned to work.[4] She wanted a different job at Wal-Mart and Kirehmeier offered her a lower-paying position, which she rejected.
The record established for purposes of summary judgment that Adler was subjected to a sexually hostile work environment by her eoworkers. Because the harassment was by her peers rather than by her supervisors, Harrison v. Eddy Potash, Inc., 112 F.3d 1437 (10th Cir.1997) is inapplicable. The only basis for liability is under Restatement (Second) of Agency § 219(2)(b). See Hirase-Doi v. U.S. West Communications, Inc., 61 F.3d 777, 783 (10th Cir.1995). Generally, an employer is liable for sexual harassment by an employee’s peers when its management level employees, agents, or supervisory employees knew or should have known of the harassment and failed to take prompt and effective remedial measures. See 29 C.F.R. § 1604.11(e); Hirase-Doi, 61 F.3d at 783. In addition, an employer will be charged with knowledge of egregious, numerous, and concentrated incidents that' add up to a campaign of harassment. See id. at 783-84.
The portions of the record specifically cited to the district court contain substantial evi *684 dence that in addition- to the reported harassment by Zalaznik and floor workers, Adler was subjected to an eight-month campaign of continuous sexual harassment by Berwick and McFarland. Although Adler did not make a formal report until August, there was evidence cited to the district court that WalMart either knew about it or should have known about it and failed to take prompt remedial action. Adler testified that sometime before the August 14 incidents, Adler told three Wal-Mart supervisors, including Larson, of the ongoing harassment. Some of the incidents were observed by supervisors. The ongoing harassment was also widely known among her coworkers because she told them about it. It could reasonably be inferred that the campaign of harassment was so constant, went on so long, and was so widely known that reasonably alert management should, have learned about it before August 14 and'should have done something to stop it before then.
Adler also presented evidence to support her theory that Wal-Mart’s response after learning of the harassment was inappropriate. An employer’s action is appropriate when it “fully remedies the conduct without adversely affecting the terms or conditions of the charging party’s employment in some manner,” for example, by transfer to a" less desirable location. EEOC Compliancé Manual (CCH) § 615.4(a)(9)(iii), 3103, 3213 (1988). Employers have a duty to' express strong disapproval of sexual harassment and to develop appropriate sanctions. See 29 C.F.R. § 1604.11(f).
When an employee is sexually harassed by one coworker, it is appropriate to measure the effectiveness of the employer’s remedial measures by their effect on that one coworker. Measures reasonably calculated to end that coworker’s harassment are sufficient. See Hirase-Doi, 61 F.3d at 786. Frequently, however, there are multiple harassers. Where, as here, one woman enters a previously all-male workplace, it is not uncommon for a large segment of the male workforce to sexually.harass the female newcomer. See, e.g., Winsor v. Hinckley Dodge, Inc., 79 F.3d 996 (10th Cir.1996); Carr v. Allison Gas Turbine Div., General Motors Corp., 32 F.3d 1007 (7th Cir.1994); Waltman v. International Paper Co., 875 F.2d 468 (5th Cir.1989); Katz v. Dole, 709 F.2d 251 (4th Cir.1983). When an employee is subjected to recurring sexual harassment by multiple coworkers, incident-by-incident measures aimed at particular harassers may be sufficient to stop harassment by those individuals but insufficient to deter others. Measures that stop some harassers but do not deter others are small comfort to the victim. Rather than focusing on whether a given individual recurrently harassed the victim, the focus should be on whether the victim was subjected to recurring acts of harassment. See Harris v. Forklift Sys., Inc., 510 U.S. 17, 20-23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); Winsor, 79 F.3d at 1002. Particularly in a multiple harasser situation, the reasonableness of an employer’s remedial measures must depend on their ability to stop both the past harassment and deter potential harassers. See Ellison v. Brady, 924 F.2d 872, 882 (9th Cir.1991).
Wal-Mart management had actual knowledge of the first two outbreaks of harassment against Adler—the harassment by floor workers and by Zalaznik. Prompt action by Kirchmeier stopped the harassment by the floor workers. Although Zalaznik stopped harassing Adler after he was counseled, management should have known by this time that harassment of Adler was not a problem with just one particular coworker. Management knew bringing a female into the maintenance shop would cause problems and it knew more than one coworker had harassed Adler. The initial measures that stopped harassment by the floor workers and by Zalaznik were not effective in deterring others. Moreover, Larson deterred Adler from reporting further harassment to Kirchmeier by implying she would be fired if she did not work things out with Zalaznik. Berwick and McFarland were obviously, not-deterred and committed the most serious harassment by engaging in an eight-month campaign of constant harassment against Adler.
When management finally took action after Adler had formally reported the August 14 incidents, Berwick and McFarland were disciplined, but Adler was disciplined as well. *685 The discipline given to Berwick and McFarland was not severe and was not widely known among the employees. Not even Adler knew they had been disciplined. Although the remedial measures again succeeded in stopping harassment by the particular harassers, the measures were not effective in deterring others because Medina and Runyon later harassed Adler. Moreover, the response to Adler’s report of harassment by Medina and Runyon was not reasonably calculated to end harassment. Runyon regarded the matter as a joke, and Larson indicated to Adler she was making a big deal of it.
Motivation and causation may, of course, be proved by circumstantial evidence. See Ready Mixed Concrete Co. v. National Labor Relations Board, 81 F.3d 1546, 1550 (10th Cir.1996). The majority, however, would require direct testimony from Runyon and Medina that they knew of and were motivated by Wal-Mart’s responses to the harassment by Berwick and McFarland to prove a nexus between their harassment and the prior responses to harassment. This kind of direct evidence is rarely available in a discrimination case and circumstantial evidence is sufficient. Daniel v. Loveridge, 32 F.3d 1472, 1476 (10th Cir.1994). The circumstantial evidence was sufficient to establish for purposes of summary judgment that the discipline given to Berwick and McFarland did not deter Runyon and Medina from harassing Adler. After months of harassment by multiple workers, Wal-Mart did not send a message to the workforce that harassment would not be tolerated. Under these circumstances, it can reasonably be inferred that Medina and Runyon were not deterred by Wal-Mart’s prior remedial measures.
After the report of the August 14 incidents, management could justifiably have fired Berwick and McFarland for harassment, thereby sending a clear message to the workforce that Wal-Mart would not tolerate sexual harassment. Short of that, Wal-Mart could have at least gathered the workforce together and told them sexual harassment would not be tolerated and that individuals who continued to sexually harass Adler would be subject to discipline, including termination.
I conclude it is for the trier of fact to determine whether Wal-Mart knew or should have known of the ongoing harassment and failed to take prompt and effective remedial measures. I would affirm the entry of summary judgment on the outrageous conduct claim and reverse the district court’s entry of summary judgment on the sexual harassment claim.

. There is no indication in the court’s ruling that it looked only at record pages specifically cited by the parties. The District of Colorado has no local rule requiring parties to refer with particularity to those portions of the record on which they rely in support of or in opposition to motions for summaiy judgment. For all we know, the court reviewed the complete depositions as the record was not massive.

. The statements in the verified complaint are not, as the majority asserts, conclusory allegations. A verified complaint stating facts that would be admissible at trial and that are based on plaintiff’s personal knowledge has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment. See Conaway v. Smith, 853 F.2d 789, 792 (10th Cir.1988).

. Unlike the majority, I see no hearsay problem with this statement. It is immaterial whether Kirehmeier actually told Larson that Adler's job was in jeopardy. What matters is that Larson told her Kirehmeier said her job was in jeopardy. The statement is important not for the truth of the matter asserted but for the fact that Larson made the statement to Adler, thereby making her reluctant to report harassment.

. Contrary to the majority’s assertion, the evidence of Runyon’s reaction to Adler's report was cited to the district court. Although Adler did not specifically cite these deposition pages to the district court, the defendant did.